# AFFIDAVIT

I, Benjamin Bentancurd, being duly sworn, hereby depose and state that the following is true to the best of my information, knowledge, and belief:

## INTRODUCTION AND AGENT BACKROUND

1. I am a Special Agent of Homeland Security Investigations (HSI), and have been since 2008. Currently, I am assigned to the Special Agent in Charge (SAC) Denver, Colorado Office of HSI, and specifically to the Contraband Smuggling and Human Trafficking Investigations group. I investigate drug trafficking, including criminal violations related to Title 21, and bulk currency smuggling in the normal course of my duties, and I am fully familiar with the facts of this case. During my career, I have conducted numerous drug importation and distribution investigations involving Federally controlled substances, including, but not limited to, heroin, cocaine, marijuana, and methamphetamine. I have received training and instruction in this field and have had the opportunity to participate in investigations relating to it.

2. This affidavit is submitted in support of an application for a search warrant for a Device, (more fully described in Attachment A), and the data located therein, there being probable cause to believe that located in the place described in Attachment A are items described in Attachment B, being evidence, fruits, and instrumentalities of violations of 21 U.S.C. § 841(a)(1), (b)(1)(A)(viii), possession with intent to distribute 500 grams or more of a mixture or substance containing a detectable amount of methamphetamine and 21 U.S.C. § 846 Attempt and Conspiracy.

3. Because this affidavit is being submitted for the limited purpose of securing a search warrant, I have not included each and every fact known to me concerning this investigation. I have set forth facts that I believe are necessary to establish probable cause to believe that evidence, fruits, and instrumentalities of violations of 21 U.S.C. § 841(a)(1), (b)(1)(A)(viii), possession with intent to distribute 500 grams or more of a mixture or substance containing a detectable amount of methamphetamine and 21 U.S.C. § 846 Attempt and Conspiracy are located in the place described in Attachment A.

4. The information contained within the affidavit comes from my personal observations, my training and experience, and information obtained from other agents, law enforcement officials, and witnesses involved in this investigation.

## IDENTIFICATION OF THE DEVICE TO BE EXAMINED

5. Several items are held in evidence at the HSI SAC Denver Evidence Room in Greenwood Village, Colorado, which were discovered in the possession of Christopher Ramon LUNA hereinafter identified as (LUNA) and seized incident to arrest. They are held in evidence under case number DE13HR19EP0005. The items include 1 iPhone Mobile communication device (cell phone) bearing International Mobile Equipment Identity (IMEI) 357345099087320 on the sim card, hereinafter and in Attachments A and B identified as the "Device."

6. Your Affiant believes there is probable cause to believe that the Device is or contains evidence, fruits, and instrumentalities of violations of 21 U.S.C. § 841(a)(1), (b)(1)(A)(viii), possession with intent to distribute 500 grams or more of a mixture or substance containing a detectable amount of methamphetamine and 21 U.S.C. § 846 Attempt and Conspiracy. The applied-for warrant would authorize the forensic examination of the Device for the purpose of identifying electronically stored data particularly described in Attachment B.

7. The Device is currently in the lawful possession of the HSI. They came into the HSI's possession in the following way: your Affiant first identified the device as belonging to LUNA at the Denver Police Department District 1 station located at 1311 W. 46th Avenue, Denver, CO during LUNA's post-arrest interview. During the interview, LUNA requested access to his phone and was allowed to retrieve phone numbers from the Device in order to take with him into jail. LUNA subsequently provided verbal consent to Your Affiant to search the Device and provided the Device unlock pin. LUNA identified the Device as an iPhone XR. LUNA provided your Affiant verbal consent to search the phone for text/call information. Your Affiant seized the Device and stored it as evidence. Although LUNA provided verbal consent to investigators to search the Device, out of an abundance of caution and to ensure the search does not exceed the scope of LUNA's consent, your Affiant seeks a search warrant to search the Device.

8. The Device is currently in storage at 5445 Denver Tech Center Parkway, Suite 600, Greenwood Village, CO. In my training and experience, I know that the Device has been stored in a manner in which the contents are, to the extent material to this investigation, in substantially the same state as they were when the Device first came into the possession of the HSI.

### ELECTRONIC STORAGE AND FORENSIC ANALYSIS

9. Based on my training and experience, your Affiant knows about the following items, hereinafter and in the Attachments referred to as the "Device."

10. A wireless telephone (or mobile telephone, or cellular telephone) is a handheld wireless device used for voice and data communication through radio signals. These telephones send signals through networks of transmitter/receivers, enabling communication with other wireless telephones or traditional "land line" telephones. A wireless telephone usually contains a "call log," which records the telephone number, date, and time of calls made to and from the phone. In addition to enabling voice communications, wireless telephones offer a broad range of capabilities. These capabilities include: storing names and phone numbers in electronic "address books;" sending, receiving, and storing text messages and e-mail; taking, sending, receiving, and storing still photographs and moving video; storing and playing back audio files; storing dates, appointments, and other information on personal calendars; and accessing and downloading information from the Internet including websites, social media sites, bulletin boards, file sharing, and other Internet sites. Wireless telephones often have a subscriber identity module or subscriber identification module ("SIM"), which is an integrated circuit that securely stores the International Mobile Subscriber Identity ("IMSI") and the related key used to identify and authenticate subscribers on mobile telephone devices. A SIM is embedded into a removable "SIM card," which can be transferred between different mobile devices. A SIM card contains a unique serial number ("ICCID"), IMSI, security authentication and ciphering information, temporary information related to the local network, a list of the services to which the user has access, and certain passwords. Most SIM cards will also store certain usage data, such as call history, text ("SMS") messages, and phone book contacts. Such telephones may also contain removable storage media, such as a flash card—such devices can store any digital data, and can have the capacity to store many gigabytes of data. Wireless telephones may also be "smartphones," such that they operate as personal computers capable of accessing the Internet. They operate as GPS navigation devices and can store information about where they have been. They also contain digital cameras. The camera can mark a photo with location data so that upon examination it can be determined where and when a photo was taken. These images can sometimes be recovered even if the user has deleted the image. The smartphone can also connect to the internet using wireless connections, which allow for images, files and other information to be uploaded directly to the Internet or to other digital storage devices or computers. Smartphones also have software, giving them the same capabilities as personal computers including accessing and editing word processing documents, spreadsheets, and

presentations. They can also operate as a "tablet," or mobile computer, and can contain software programs called applications. Those programs can perform different functions and save data associated with those functions, including use associated with the Internet. They also operate as personal digital assistants and have contacts and calendar functions. They also can contain media such as music and other files in large quantity.

11. Based on my knowledge, training, and experience, your Affiant knows that the Device can store information for long periods of time. Similarly, things that have been searched for and viewed via the Internet are typically stored for some period of time on the Device. This information can often be recovered with forensic tools.

12. Based on my knowledge, training, and experience, examining data stored on a digital storage device such as the Device can uncover, among other things, evidence that reveals or suggests who possessed or used the computer or digital storage devices.

13. There is probable cause to believe that things that were once stored on the Device may still be stored there, for at least the following reasons:

    A. Based on my knowledge, training, and experience, I know that digital files or remnants of such files can be recovered months or even years after they have been downloaded onto a storage medium, deleted, or viewed via the Internet. Electronic files downloaded to a storage medium can be stored for years at little or no cost. Even when files have been deleted, they can be recovered months or years later using forensic tools. This is so because when a person "deletes" a file on a digital storage device or computer, the data contained in the file does not actually disappear; rather, that data remains on the storage medium until it is overwritten by new data.

    B. Wholly apart from user-generated files, digital devices like the Device can contain electronic evidence of how it has been used, what it has been used for, and who has used it. To give a few examples, this forensic evidence can take the form of operating system configurations, artifacts from operating system or application operations. Users typically do not erase or delete this evidence, because special software is typically required for that task. However, it is technically possible to delete this information.

    C. Similarly, files that have been viewed via the Internet are sometimes automatically downloaded into a temporary Internet directory or "cache." Forensic review may also disclose when and by whom the Internet was used to conduct searches, view material, and communicate with others via the Internet.

14. *Forensic evidence*. As further described in Attachment B, this application seeks permission to locate not only electronically stored information on the Device that might serve as direct evidence of the crimes described on the warrant, but also forensic evidence that establishes how the Device wasused, the purpose of the use, who used the Device, and when. There is probable cause to believe that this forensic electronic evidence might be on the Device because:

    A. Data on the storage medium can provide evidence of a file that was once on the storage media but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file). Virtual memory paging systems can leave traces of information on the storage medium that show what tasks and processes were recently active. Web browsers, e-mail programs, and chat programs store configuration information on the storage medium that can reveal information such as online nicknames and passwords. Operating systems can record additional information, such as the attachment of peripherals, the attachment of other

devices to it, and the dates and times the device was in use. Computer file systems can record information about the dates files were created and the sequence in which they were created. This information can be recovered months or even years after they have been downloaded onto the storage medium, deleted, or viewed.

B. Forensic evidence on a device can also indicate who has used or controlled the device. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence.

C. A person with appropriate familiarity with how devices such as a smartphone works may, after examining this forensic evidence in its proper context, be able to draw conclusions about how the devices were used, the purpose of their use, who used them, and when.

D. The process of identifying the exact electronically stored information on a smartphone or other digital device that is necessary to draw an accurate conclusion is a dynamic process. Electronic evidence is not always data that can be merely reviewed by a review team and passed along to investigators. Whether data stored on a device is evidence may depend on other information stored on the device and the application of knowledge about how a device behaves. Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

E. Further, in finding evidence of how a device was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on a storage medium.

F. Your Affiant knows that when an individual uses an electronic device to aid in the commission of a crime, the individual's electronic device will generally serve both as an instrumentality for committing the crime, and also as a storage medium for evidence of the crime. The electronic device is an instrumentality of the crime because it is used as a means of committing the criminal offense. The electronic device is also likely to be a storage medium for evidence of crime. Based on training and experience, your Affiant anticipates that an electronic device, such as the Device, used to commit a crime of the type described herein may contain: Phone Call logs & Text Messages with other members of the conspiracy, Photographs of evidence, Map Searches and location history, financial transactions detailing expenses undertaken in furtherance of the conspiracy, and other evidence related to acts undertaken in furtherance of the conspiracy, as well as evidence demonstrating the identities and roles of the co-conspirators.

G. Your Affiant also knows that those who engage in criminal activity will attempt to conceal evidence of the activity by hiding files, by renaming the format, (such as saving a .pdf image file as a .doc document file) or by giving them deceptive names such that it is necessary to view the contents of each file to determine what it contains.

15. *Need to review evidence over time and to maintain entirety of evidence*. Your Affiant recognizes the prudence requisite in reviewing and preserving in its original form only such records applicable to the violations of law described in this Affidavit and in Attachment B in order to prevent unnecessary invasion of privacy and overbroad searches. Your Affiant advises it would be impractical and infeasible for the Government to review the mirrored images of digital devices that are copied as a result of a search warrant issued pursuant to this Application during a single analysis. Your Affiant has learned through practical experience that various pieces of evidence retrieved from digital devices in investigations of this sort often have unknown probative value and linkage to other pieces of

evidence in the investigation until they are considered within the fluid, active, and ongoing investigation of the whole as it develops.  In other words, the weight of each individual piece of the data fluctuates based upon additional investigative measures undertaken, other documents under review and incorporation of evidence into a consolidated whole.  Analysis is content-relational, and the importance of any associated data may grow whenever further analysis is performed. The full scope and meaning of the whole of the data is lost if each piece is observed individually, and not in sum. Due to the interrelation and correlation between pieces of an investigation as that investigation continues, looking at one piece of information may lose its full evidentiary value if it is related to another piece of information, yet its complement is not preserved along with the original.  In the past, your Affiant has reviewed activity and data on digital devices pursuant to search warrants in the course of ongoing criminal investigations.  Your affiant has learned from that experience, as well as other investigative efforts, that multiple reviews of the data at different times is necessary to understand the full value of the information contained therein, and to determine whether it is within the scope of the items sought in Attachment B.  In order to obtain the full picture and meaning of the data from the information sought in Attachments A and B of this application, the Government would need to maintain access to all of the resultant data, as the completeness and potential of probative value of the data must be assessed within the full scope of the investigation.  As such, your Affiant respectfully requests the ability to maintain the whole of the data obtained as a result of the search warrant, and to maintain and to review the data in the control and custody of the Government and law enforcement at times deemed necessary during the investigation, rather than minimize the content to certain communications deemed important at one time.  As with all evidence, the Government will maintain the evidence and mirror images of the evidence in its custody and control, without alteration, amendment, or access by persons unrelated to the investigation.

16. *Nature of examination*.  Based on the foregoing, and consistent with Rule 41(e)(2)(B), the warrant I am applying for would permit seizing, imaging, copying and reviewing the contents of the Device consistent with the warrant.  The warrant I am applying for would authorize a later examination and perhaps repeated review of the Device or information from a copy of the Device consistent with the warrant.  The examination may require authorities to employ techniques, including but not limited to computer-assisted scans of the entire medium, that might expose many parts of the Device to human inspection in order to determine whether it is evidence described by the warrant.

## INVESTIGATION

17. During January 2019 to March 2019, HSI SAC Denver Special Agents were engaged in undercover conversations with unknown individuals for the purchase of multiple pounds of methamphetamine. On March 1, 2019, an unknown male told an HSI undercover agent (UCA-1) via telephone that he had a drug shipment in Denver, Colorado, ready to be delivered to the UCA-1, adding that a female would be delivering 20 pounds of methamphetamine. UCA-1 and the unknown female subsequently communicated directly by phone and agreed to meet at a Motel 6 in Denver, Colorado, on March 1, 2019. A second undercover agent, UCA-2, was sent to meet with the unknown female, later identified as Ingrid FRANCO.

18. On or about March 1, 2019, HSI Special Agents and officers and detectives from the Denver Police Department (DPD) arrived at the Motel 6 located at 3050 W. 49th Avenue, Denver, Colorado, in anticipation of the drug transaction. At approximately 11:55 am, a white Acura arrived and parked near UCA-2's vehicle. Christian ZAZUETA was driving the Acura, Christopher LUNA was the front passenger, and Ingrid FRANCO was a rear passenger. ZAZUETA exited the Acura and, after speaking briefly with UCA-2, approached the rear of the Acura, which had an attached luggage carrier. ZAZUETA reached inside a bin on the luggage carrier, and reached around inside. FRANCO then approached and directed ZAZUETA to the bottom on the bin, under some blankets. He then pulled out a blue bag, which he opened, showing UCA-2 a large number of bundles. FRANCO and

ZAZUETA both stated that there were 17 bundles and that they were overweight. Investigators originally mistakenly believed that both FRANCO and ZAZUETA indicated that there were 16 bundles instead of 17. However, after reviewing recordings of these statements, your Affiant confirmed that FRANCO and ZAZUETA stated that there were 17 bundles.

19. At this point, UCA-2 walked away, stating that he/she was going to retrieve the payment money. At this point, FRANCO re-entered the Acura, taking the bundles with her, while ZAZUETA secured the tarp over the bin on the luggage rack.

20. Shortly thereafter, after receiving a prearranged signal from the UCA-2, other law enforcement officers approached. FRANCO and ZAZUETA were detained and identified, along with Christian LUNA. All subjects claimed to be from California. During a search of the vehicle, agents and detectives located the blue bag in the rear passenger area, where FRANCO had been seated. The bag contained 17 bundles of what later field tested positive for methamphetamine.

21. The drug evidence was taken to the HSI SAC Denver office where it was counted, weighed, and field tested. A total of 17 bundles wrapped in cellophane were seized. The approximate gross weight of the methamphetamine was 9.28 Kilograms (20.4 lbs.). Your Affiant conducted a field test of two random bundles, both of which presented a presumptively positive result for the presence of methamphetamine.

22. FRANCO, ZAZUETA, and LUNA were transported to the DPD District 1 police station for further investigation. At the DPD District 1 police station, your Affiant and DPD Detective Jose Garcia interviewed FRANCO, ZAZUETA, and LUNA.

### Interview of FRANCO

23. During her transport from the Motel 6 to the Denver PD station, FRANCO was verbally advised of her Miranda Warnings by Denver PD Det. Jose Garcia. FRANCO requested to speak with an attorney. At the Denver PD station, Det. Garcia was advised by Denver Police officer Adolph CHAVEZ, that FRANCO had requested to speak with investigators regarding her arrest.

24. FRANCO was provided an opportunity to speak with your Affiant and Det. Garcia. Prior to questioning, your Affiant read FRANCO her Miranda Warnings from a pre-printed Miranda form. FRANCO acknowledged that she understood her rights and signed the form, agreeing to answer questions without the presence of legal counsel. FRANCO's interview was audio and video recorded.

25. During her interview, FRANCO stated she was directed by a person, whom she failed to fully identify, to deliver 20 pounds of methamphetamine in Denver, Colorado. FRANCO stated the three of them had to travel to Minnesota to take possession of the drugs and bring them to Denver, CO. FRANCO stated she expected to be paid $15,000 from the sale of the narcotics.

26. FRANCO stated that her son, ZAZUETA, was also involved in the scheme to distribute the narcotics. However, FRANCO stated LUNA did not know about the drug conspiracy. Based on training and experience and information learned during this investigation, your Afffiant believes FRANCO is not privy to all conversations between her son, ZAZUETA, and LUNA.

27. Your Affiant also has reason to believe, based on training and experience, that FRANCO was not fully forthright during her interview with investigators. During her interview, FRANCO stated that she did not know that LUNA had a prior drug arrest. During FRANCO's booking process into the

6

U.S. Marshals on March 4th, 2019, however, FRANCO and ZAZUETA stated they attended a court proceeding of LUNA's pursuant to his arrest related to Imporation of Controlled Substances in 2016.

<u>Interview of ZAZUETA</u>

28. Prior to questioning, your Affiant read ZAZUETA his Miranda Warning from a pre-printed Miranda form. ZAZUETA acknowledged that he understood his rights and signed the form, agreeing to answer questions without the presence of legal counsel. ZAZUETA's interview was audio and video recorded.

29. During his interview, ZAZUETA stated he had received the drugs in California from an associate, whom he failed to fully identify. ZAZUETA further stated that he attempted to sell the drugs in Minnesota, but when the deal did not transpire, he brought the drugs to Denver, Colorado, to sell them to an unknown female. ZAZUETA stated he made and/or received phone calls in furtherance of the conspiracy to distribute drugs. Although he was unsure as to an amount, ZAZUETA stated he wanted to be paid from the sale of the narcotics.

30. When questioned as to LUNA's reason for being present during the trip, ZAZUETA stated he wanted LUNA's help with driving. ZAZUETA was questioned about a traffic stop in Minesstoa, to which ZAZUETA admitted he was driving and was cited for driving without a license. ZAZUETA stated LUNA drove the vehicle after the traffic stop.

31. ZAZUETA initially claimed LUNA did not know about the drugs. ZAZUETA eventually admitted LUNA knew about the drugs and further stated that he was going to give LUNA some money for LUNA's assistance driving. ZAZUETA was asked if LUNA was going to sell the drugs, if LUNA knew how much drugs were involved, or if he saw the drugs, to which ZAZUETA stated no, claiming it was his (ZAZUETA's) deal. ZAZUETA was asked if LUNA knew specifically what drugs were being transported to which ZAZUETA stated LUNA knew "something" but did not know exactly. ZAZUETA stated that once they got "out here," he told LUNA "what it is," meaning the purpose of their trip, and that LUNA was "pissed." ZAZUETA stated that he was not sure how much he was going to give LUNA for his assistance, but that he would have possibly given LUNA $1000.

32. Your Affiant also has reason to believe, based on training and experience, that ZAZUETA was not fully forthright during his interview with investigators. ZAZUETA stated during his interview, he wanted to take responsibility for the drugs, adding that he wanted his mom (FRANCO) to go home. Based on these statements, as well as training and experience, your affiant believes ZAZUETA was minimizing FRANCO's and LUNA's role in the conspiracy, in an attempt to alleviate them of culpability. ZAZUETA, however, subsequently admitted that FRANCO was involved in the conspiracy, and told investigators that he told LUNA about the purpose of the trip prior to the attempted sale.

<u>Interview of LUNA</u>

33. Prior to questioning, Your Affiant read LUNA his Miranda Warnings from a pre-printed Miranda form. LUNA acknowledged that he understood his rights and when asked if he wanted to speak with investigators, LUNA began speaking freely. LUNA appeared competent and alert during the interview, and did not appear to be under the influence of any substances. LUNA appeared to understand his rights and the consequences of his decision to speak to investigators. When LUNA began to speak, your Affiant understood LUNA's conduct to mean he intended to waive his Miranda rights to speak with investigators. LUNA's interview was audio and video recorded.

34. During his interview, LUNA stated he did not know about the drugs, adding that ZAZUETA was his good friend and would corroborate his story. When asked if he was the owner of the drugs or was going to sell them, LUNA stated he does not have the financial means to sell drugs, adding that he is struggling financially. LUNA further stated that he had gone along for the ride with FRANCO and ZAZUETA, and that he was helping his friend ZAZUETA. LUNA stated that he and ZAZUETA have been friends since middle school. When asked why he was in Colorado, LUNA stated he was invited by ZAZUETA to travel to visit ZAZUETA's cousin, despite the fact he is on federal probation with travel restrictions. LUNA is on supervised release in connection with a 2017 federal conviction in the Southern District of California for drug importation involving cocaine and methamphetamine from Mexico into the United States.

35. Your Affiant has reason to believe, based on training and experience, that LUNA was not fully forthright during his interview with investigators. During his interview, LUNA stated that he, FRANCO, and ZAZUETA, left Coachella, CA on or about February 22, 2019. LUNA stated he was not working and had nothing to do. LUNA was asked where he, FRANCO, and ZAZUETA traveled to when they left California, to which LUNA stated "to right here," which your Affiant understood to mean Colorado. When pressed on the timeline and travel history, LUNA then admitted that he, FRANCO, and ZAZUETA traveled to Minnesota to visit ZAZUETA's cousin. LUNA further added they stayed in a hotel in Minnesota, and a search of the LUNA's wallet revealed Hyatt Hotel room key cards that your Affiant believes is from the hotel where LUNA, FRANCO, and ZAZUETA stayed in Minnesota.

36. During their interviews, ZAZUETA and FRANCO both stated that the purpose of the trip to Minnesota was to conduct a drug transaction, with no mention of visiting a relative in Minnesota. FRANCO and ZAZUETA stated their relatives live in Ft. Collins, Colorado.

37. Additionally, LUNA was asked if he had driven the vehicle at all, to which he stated no. Thereafter, your Affiant asked LUNA about a traffic stop in Minnesota involving ZAZUETA. LUNA then admitted he drove the vehicle after the traffic stop in Minnesota. On March 13, 2019, your affiant spoke with Watonwan County Sherrif's officer, Brandon Sprenger, who conducted the traffic stop and issued the aforementioned citation to ZAZUETA in Minnesota. Officer Sprenger stated ZAZUETA was in fact driving and presented no driver's license. Officer Sprenger confirmed that LUNA drove the vehicle upon termination of the traffic stop.

38. Although LUNA repeatedly claimed he did not ask FRANCO and ZAZUETA questions, did not see anything, and that he did not know about any drugs, ZAZUETA stated in his interview, that he told LUNA about the drugs. LUNA claimed no knowledge of drugs in the vehicle. LUNA did admit that he uses cocaine.

39. LUNA was allowed to retrive phone numbers from the device. LUNA was allowed to call his Federal Probation Officer during the interview. LUNA admitted to his Probation Officer, P.O. Lopez, that he knew he was not supposed to be in Denver, CO but added that he had no knowledge of the drugs in the vehicle.

40. Based on your Affiant's investigation, your Affiant understands that LUNA uses and/or has access to the accounts "gavasmobilewash" on Instagram and "@gorditobiilletes" on Twitter. Your Affiant further believes that LUNA accesses these accounts on the Device described in Attachment A hereto, and had access to these accounts on or about the date(s) of the conspiracy. Accordingly, your Affiant's search of the Device described in Attachment A will include a search for information related to these accounts, as well as others, as set forth in Attachment B.

8

## PROCEDURAL HISTORY

41. On March 2, 2019, your Affiant submitted an Affidavit in support of a Complaint charging LUNA, FRANCO, and ZAZUETA with violations of 21 U.S.C. §§ 841(a)(1) and 841(b)(1)(A)(viii), and 21 U.S.C. § 846.  The Complaint was signed by Magistrate Judge Nina Y. Wang that same day.

42. On March 4, 2019, LUNA, FRANCO, and ZAZUETA appeared in U.S. District Court for the District of Colorado before Magistrate Judge Michael E. Hegarty for their initial appearances.

43. On March 7, 2019, a Preliminary Hearing was held before Magistrate Judge Hegarty.  Following the Preliminary Hearing, Magistrate Judge Hegarty ruled that there was probable cause to believe that LUNA had committed the offenses charged in the Complaint.  Both ZAZUETA and FRANCO waived their rights to a preliminary hearing.

44. Since that time, your Affiant has engaged in additional investigation of LUNA, FRANCO, and ZAZUETA, including the issuance of a subpoena to the Hyatt Hotel and Resorts and sending the drug evidence to a DEA lab for chemical analysis and potential fingerprint identification.  The investigation remains ongoing.

## **CONCLUSION**

45. As set forth above, your Affiant knows FRANCO arranged the drug transaction with UC-1, UC-2, and other unknown individuals via communications on her cell phone.  Based on this information, as well as additional facts set forth herein including but not limited to LUNA's, ZAZUETA's and FRANCO's close relationship, LUNA's evasiveness during his interview, LUNA's presence at the drug transaction in violation of his supervised release, and LUNA's admission that he drove the vehicle containing the drugs, probable cause exists to believe that inside the Device (described on Attachment A), will be found evidence, fruits, and instrumentalities of a violation of 21 U.S.C. § 841(a)(1), (b)(1)(A)(viii), possession with intent to distribute 500 grams or more of a mixture or substance containing a detectable amount of methamphetamine and 21 U.S.C. § 846 Attempt and Conspiracy (described on Attachment B).

46. Specifically, your Affiant believes that LUNA may have used the Device in a similar manner to FRANCO's cell phone usage to discuss the object of the conspiracy and actions performed in furtherance of the conspiracy, including coordinating with co-conspirators FRANCO and ZAZUETA, arranging pick-up of the drugs, the planned sale of the drugs, drug prices, and other information related to the drug transaction.

//

//

//

//

//

//

47. I, therefore, respectfully request that the attached warrant be issued authorizing the search and seizure of the items described in Attachment A for the items listed in Attachment B.

I declare under penalty of perjury that the foregoing is true and correct to the best of my information, knowledge, and belief.

*Benjamin Bentancurd / HSI*
Special Agent Benjamin Bentancurd
Homeland Security Investigations

SUBSCRIBED and SWORN before me this __15th__ day of March, 2019.

*[signature: Michael E. Hegarty]*
THE HON. MICHAEL E. HEGARTY
UNITED STATES MAGISTRATE JUDGE

Application for search warrant was reviewed and is submitted by Conor A. Flanigan, Assistant United States Attorney.